IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 9, 2024

**STATE OF TENNESSEE v. BILLY D. WOODARD JR.**

**Appeal from the Criminal Court for Wilson County**
**No. 20-CR-512      Brody N. Kane, Judge**

———————————————————

**No. M2024-00554-CCA-R3-CD**

———————————————————

The Defendant, Billy D. Woodard, Jr., appeals the Wilson County Criminal Court's order revoking his probation and requiring him to serve the original five-year sentence for his theft conviction in confinement. The Defendant contends the trial court abused its discretion in revoking his probation and ordering him to serve his sentence in confinement (1) by relying on grounds not included in the probation violation warrant; and (2) by failing to consider any other punishment or alternative to incarceration. After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, P.J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, and JOHN W. CAMPBELL, SR., JJ., joined

Raymond (D.J.) Jones, Assistant Public Defender, Lebanon, Tennessee, for the appellant, Billy D. Woodard, Jr.

Jonathan Skrmetti, Attorney General and Reporter; Richard D. Douglas, Senior Assistant Attorney General; Jason Lawson, District Attorney General; and Justin Harris, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On November 3, 2020, the Defendant entered a guilty plea to theft of property valued at more than $10,000 and less than $60,000, in violation of Tenn. Code Ann. § 39-14-103, and received a five-year sentence which was suspended to supervised probation. On December 15, 2021, an arrest warrant was issued alleging the Defendant violated his probation by being arrested for harassment on November 26, 2021, and failing to report the arrest to his probation officer. The warrant also alleged the Defendant violated his probation by failing to pay $667.50 in court fees. On March 28, 2022, the trial court

revoked and reinstated the Defendant's probation after crediting him for time served in connection with the harassment arrest.

A second arrest warrant alleging the Defendant had violated his probation was issued on December 5, 2022. The second warrant alleged the Defendant violated his probation by failing "to verify [his] employment since being placed on probation." Specifically, the warrant alleged:

> On 11/28/22 [the probation officer] asked [the Defendant] for his most recent pay stub during [a] home visit. The [D]efendant reported he had a pay stub on his girlfriend's phone. The [D]efendant then proceeded to show [the probation officer] a pay stub. [The probation officer] could see the [D]efendant's name however [sic] could not verify a date due to the phone being blurry. The [D]efendant reported it was like that because the phone was about to die. The [D]efendant failed to verify employment and has failed to verify employment in recent months as instructed by [his] [probation officer].

The warrant also alleged the Defendant violated Rule 6 of his probation:

> On 10/12/22 [a probation officer] in Nashville received a phone call from Lena Raines. Ms. Raines identified herself as the homeowner of [the home in Nashville where the Defendant claimed to reside]. Ms. Raines reported she was the [D]efendant's aunt. Ms. Raines reported she had not seen the [D]efendant in 3 months, and he did not live at the reported address. On 11/28/22 [probation officers] met with the [D]efendant at the reported address . . . [the probation officer] stated to the [D]efendant, "We are coming into the house today to verify [your] bedroom and housing." The [D]efendant reported he did not have a key. [The probation officer] asked the [D]efendant, "How do you enter the home?" The [D]efendant reported, "When nobody is home I wait in the driveway." The [D]efendant then proceeded to contact his aunt via telephone. The [D]efendant stated he was trying to contact his aunt or his aunt's wife. The [D]efendant's girlfriend then stated from the [D]efendant's vehicle everybody in the home had covid [sic]. [The probation officer] stated, "That's okay I am vaccinated, and the home visit won't take too long." The [D]efendant then stated he had to pick his kids up from school soon. [The probation officer] stated, "That's ok it won't take long once we verify your housing." The [D]efendant's aunt's wife came out the front door and stated the [D]efendant did not live at the reported address. She did not know where he was living at the time. The [D]efendant then admitted he was homeless and did not live there and would not provide an address.

Lastly, the warrant alleged the Defendant violated his probation by failing to pay $807.50 in court fees.

A revocation hearing was held on March 19, 2024. At the hearing, the Defendant admitted to violating his probation as alleged in the second warrant. There was no other proof offered at the hearing, and defense counsel informed the trial court that the Defendant had multiple employment opportunities available to him should he remain on probation. Defense counsel requested that probation be reinstated so the Defendant would be eligible for a suspended sentence on an unrelated criminal matter in Davidson County for which the Defendant had been in custody for nearly a year at the time of the hearing. Defense counsel also argued revocation was unnecessary because the Defendant had taken classes while in custody and was accepted into the Men of Valor, a Christian philanthropic organization aimed at helping convicts successfully re-enter the community.

The trial court commended the probation officer for having an answer to "every excuse" the Defendant gave to justify his probation violations. The trial court also expressed concerns about the "evasion" and "deception" the Defendant engaged in, including his "girlfriend's helping out and . . . saying stuff about COVID and everything else." The Defendant insisted his girlfriend never spoke with his probation officer during the visit to the Defendant's aunt's house and that his girlfriend would "tell [the court] the same thing" if she was at the hearing.

The probation officer was present at the hearing and refuted the Defendant's characterization of his visit to the Defendant's aunt's house and reiterated the facts as alleged in the warrant regarding the Defendant's girlfriend's actions during the visit. The probation officer also alleged that, after the warrant had been issued, he received text messages from someone purporting to be the Defendant's brother claiming the Defendant was dead. After receiving the text messages, the probation officer found a fake obituary for the Defendant on "a funeral home website." The trial court inquired about the fake obituary, and the probation officer retrieved it from an online website during the hearing. The fake obituary featured a photograph of the Defendant wearing a wrestling championship belt along with dates indicating the Defendant died on February 6, 2023, two days after the second warrant was issued. It also contained text stating that the Defendant "was a loving person served [sic] by his father Billy, dean Woodard [sic] and grandfather, Billy Raines sr [sic]." As the trial court noted, the phrase "served by" in the fake obituary appears to be a misspelling of the phrase "survived by."

Defense counsel objected to the trial court's consideration of the fake obituary, arguing the Defendant had no notice of the obituary because it was not included in the warrant. The Defendant also denied having any knowledge of the fake obituary. The trial court stated as follows:

You know, the Men of Valor is an excellent program. But . . . anybody that would fake their death or have somebody fake their death and contact [the probation officer]—who else would have his number? . . . You've got some deception here . . . about all this that happened out there at the [Defendant's aunt's] house. And then, this, proving to me—for the record, it's a website for a funeral home . . . showing a picture of [the Defendant] with a wrestling belt on, giving that he passed away on February 6th of, I think it was this year, maybe it was last year.

Well, you did violate the terms of probation. I think you used deception on repeated occasions. You even said the girlfriend didn't say what the warrant says she said, about the COVID thing. You claim no knowledge about this other deal . . . .

I'm going to have you do your time. I can't trust you. I think you had something to do with this. And I just can't have anybody claiming they're deceased. So disappointed. I'm going to revoke you to serve, [the Defendant].

The Defendant timely filed an appeal of the trial court's order, and this case is properly before this court for review.

## ANALYSIS

The Defendant argues the trial court abused its discretion (1) by relying, in part, on facts not alleged in the violation warrant in revoking the Defendant's probation, reinstating his sentence, and ordering confinement; and (2) by failing to consider other punishments or alternatives to incarceration in ordering the Defendant to serve his original sentence in confinement. The Defendant specifically argues it was improper for the trial court to base its decision to revoke his probation and order him to serve his original sentence on the fake obituary because the fake obituary was not part of the violation warrant and due process requires that defendants be given adequate notice of alleged probation violations prior to their revocation hearing. See Gagnon v. Scarpelli, 411 U.S. 778, 786 (1973). The Defendant also argues the trial court failed to adequately consider other forms of punishment or alternatives to incarceration when deciding the consequences the Defendant would face as the result of the revocation of his probation.

In response, the State contends the trial court properly considered the violations alleged in the warrant during the revocation hearing and that any error in considering the fake obituary was harmless. The State argues that the trial court reasonably rejected the Defendant's request for an alternative sentence and adequately explained its reasons for ordering the Defendant to serve his original sentence in confinement.

Trial courts "possess the power, at any time within the maximum time that was directed and ordered by the court for the suspension, in accordance with § 40-35-311, to revoke the suspension." Tenn. Code Ann. § 40-35-310(a). Code section 40-35-311 provides the procedures trial courts must follow during probation revocation proceedings.

"[A] trial court may revoke a sentence of probation upon finding by a preponderance of the evidence that the defendant has violated the conditions of his release." State v. Beard, 189 S.W.3d 730, 734-35 (Tenn. Crim. App. 2005); see State v. Dagnan, 641 S.W.3d 751, 756 (Tenn. 2022). The statutes in effect at the time of the Defendant's revocation hearing authorize a trial court, after finding a defendant had violated probation, to impose one of the following consequences: (1) order incarceration for some period of time; (2) cause execution of the sentence as it was originally entered; (3) extend the defendant's probationary period by up to one year for each violation of Code section 40-35-308(c)(1); or (4) return the defendant to probation on appropriate modified conditions. Tenn. Code Ann. §§ 40-35-308, -310, -311; see Dagnan, 641 S.W.3d at 756 (citing Beard, 189 S.W.3d at 735 and n.2). If the trial court revokes a defendant's probation and suspension of sentence, then the defendant has the right to appeal. Tenn. Code Ann. § 40-35-311(e)(3); Tenn. R. App. P. 3(b).

Probation revocation involves the following two-step consideration: "[a] trial court, upon finding by a preponderance of the evidence that a defendant violated the conditions of his or her probation, must determine (1) whether to revoke probation, and (2) the appropriate consequence to impose upon revocation." Dagnan, 641 S.W.3d at 753, 757 (footnote omitted). While a trial court is required to conduct a probation revocation hearing pursuant to Code section 40-35-311(b), this two-step consideration does not obligate the trial court "to hold an additional or separate hearing to determine the appropriate consequence." Id. at 757. These two steps are "two distinct discretionary decisions, both of which must be reviewed and addressed on appeal." Id. at 757-58. "Simply recognizing that sufficient evidence existed to find that a violation occurred does not satisfy this burden." Id. at 758.

In considering the appropriate consequence to impose upon revocation, a trial court may consider, but is not limited to, the following: the number of revocations, the seriousness of the violation, the defendant's criminal history, and the defendant's character. Dagnan, 641 S.W.3d at 759 n.5. Consideration of past criminal history is only appropriate in the second part of the two-step analysis. Id. (citing State v. Fleming, No. E2017-02352-CCA-R3-CD, 2018 WL 6787580, at *3 (Tenn. Crim. App. Dec. 26, 2018) ("A trial court may not revoke probation based on past criminal acts that were known to the trial court at the time probation was originally granted.").

This court reviews a trial court's revocation of probation for an "abuse of discretion with a presumption of reasonableness so long as the trial court places sufficient findings

and the reasons for its decisions as to the revocation and the consequence on the record." Id. at 759. "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." State v. Phelps, 329 S.W.3d 436, 443 (Tenn. 2010). "It is not necessary for the trial court's findings to be particularly lengthy or detailed but only sufficient for the appellate court to conduct a meaningful review of the revocation decision." Dagnan, 641 S.W.3d at 759 (citing State v. Bise, 380 S.W.3d 682, 705-06 (Tenn. 2022)). Sufficient findings serve "'to promote meaningful appellate review and public confidence in the integrity and fairness of our judiciary.'" Id. (quoting State v. King, 432 S.W.3d 316, 322 (Tenn. 2014)). However, "[w]hen presented with a case in which the trial court failed to place its reasoning for a revocation decision on the record, the appellate court may conduct a de novo review if the record is sufficiently developed for the court to do so, or the appellate court may remand the case to the trial court to make such findings." Id. (citing King, 432 S.W.3d at 327-28).

We conclude that the trial court made the "two distinct discretionary decisions" regarding (1) whether to revoke the Defendant's probation, and (2) the appropriate consequence to impose upon revocation of the Defendant's probation. See id. at 757. The Defendant requests this court to vacate the determination of the trial court to revoke his probation because it was based, in part, on a ground not included in the probation violation affidavit; namely, the fake obituary. Citing Gagnon, 411 U.S. at 786, and due process principles of notice, the Defendant contends the trial court was prohibited from considering the fake obituary. In Gagnon, the Supreme Court held generally that defendants faced with probation revocation must receive written notice of alleged probation violations prior to their revocation hearing as part of due process. Id. at 790. In Morrissey v. Brewer, 408 U.S. 471, 490 (1972), a companion case to Gagnon, the Supreme Court held that if a parolee admits to violating their parole and the admitted violations "are found to be reasonable grounds for revoking parole under state standards, that would end the matter." See also State v. Dooley, No. E2023-00881-CCA-R3-CD, 2023 WL 8889530, at *5 (Tenn. Crim. App. Dec. 26, 2023) (citation omitted); Practy v. State, 525 S.W.2d 677, 682 (Tenn. Crim. App. 1974) ("[Defendant's] admitted [probation] violation clearly constituted sufficient ground for revoking his suspended sentence and probation . . . and, as said by the United States Supreme Court in Morrissey . . . that should 'end the matter.'").

We conclude that the due process notice requirements of Gagnon were satisfied in this case because the Defendant admitted to the probation violations as alleged in the second warrant. After defense counsel announced, "it's a plea with a request to be heard," the trial court heard from the Defendant, who agreed that he violated his probation as alleged in the second probation violation affidavit. In other words, the Defendant received adequate notice of the grounds upon which his probation was revoked, the fake obituary was not discussed until well after the Defendant admitted to the probation violation, and it

was not a part of the initial determination to revoke the Defendant's probation. Accordingly, the Defendant's violation of due process claim for lack of notice of the fake obituary must fail.

In determining the consequence for violating the Defendant's probation, the trial court engaged in a lengthy colloquy with defense counsel and the Defendant. After defense counsel advised the court (1) of the employment opportunities available to the Defendant, and (2) of the need to reinstate the Defendant's sentence because of its impact on another unrelated criminal matter, the following exchange occurred:

> THE COURT: What about this, I commend [the probation officer] because [the Defendant] had an answer for every excuse that was thrown out there. You know, the evasion, the deception, you trying to hide from him that you're not living there. And your girlfriend's helping out and she's saying stuff about COVID and everything else. Why didn't you just tell him you were homeless, if you were really homeless.

> THE DEFENDANT: Well, he, he never spoke with my girlfriend at all. He, he never spoke to –

> THE COURT: She's not the one that said everybody in the house has COVID?

> . . . .

The trial court then asked the probation officer to confirm the circumstances of the allegations in the warrant, which he did. The probation officer continued to explain to the court that "on top of that situation," the probation officer was receiving text messages from someone claiming to be the Defendant's brother alleging that the Defendant had passed away. At this point, the probation officer mentioned the fake obituary, which was objected to by defense counsel. The trial court inquired further about the obituary and presented it to the Defendant, who disavowed it. The trial court then commended the Defendant's acceptance into the Men of Valor program, which was favorable to reinstating the Defendant's probation. However, the trial court was concerned the Defendant "used deception on repeated occasions." The court relied on the probation violation affidavit and noted the repeated "evasion" and "deception" the Defendant engaged in when "trying to hide" from his probation officer the fact that he did not live at his aunt's house. The court also noted the Defendant enlisted his girlfriend who was "helping out and . . . saying stuff about COVID and everything else," and questioned why the Defendant "didn't . . . just tell" his probation officer that he was homeless, that is, "if [he] really were homeless." We acknowledge the trial court considered the fake obituary in its consequence determination. However, we view the court's consideration of the fake obituary as a part of its greater

concern that the Defendant was engaged in evasion and deception from his probation officer.  Because these concerns bear on the Defendant's character and amenability to probation, we conclude the trial court properly ordered the Defendant to serve his five-year sentence in confinement.

After carefully considering the record, we conclude that there was sufficient evidence supporting the trial court's decision to revoke the Defendant's probation and to order him to serve his five-year sentence in confinement.  See Dagnan, 641 S.W.3d. at 760.  Accordingly, the Defendant is not entitled to relief.

## CONCLUSION

Because the trial court did not abuse its discretion in revoking the Defendant's probation and ordering him to serve his five-year sentence, less jail credits, in confinement, we affirm the judgment of the trial court.

_____
CAMILLE R. MCMULLEN, PRESIDING JUDGE